UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

CHRISTOPHER SHINHOLSTER,

    Plaintiff,

v.
    606CV073

REGINALD LANGSTON,
RANDY BYRD, R.D. COLLINS
and JOHN PAUL,

    Defendants.

## ORDER

## I. INTRODUCTION

This excessive-force, 42 U.S.C. § 1983 case is going to trial on 11/3/08. Doc. # 126. The Court has before it, however, several pretrial motions. The motion (doc. # 111) of defendants R. D. Collins and John Paul to continue the trial is denied as moot (the Court rescheduled the original trial date to accommodate defense counsel). Their equipment-request motion (they want to bring special presentation equipment to trial), in contrast, is granted in part and denied in part.[1] Doc. # 113. Defendants Reginald Langston, R. D. Collins and John Paul, meanwhile, move *in limine* to exclude specific evidence against them from the trial. Doc. ## 112, 116. Shinholster opposes. Doc. # 129. Randy Byrd has filed no motions.

## II. BACKGROUND

Plaintiff Christopher Shinholster alleges that, while incarcerated at Rogers State Prison (RSP) in Georgia, he was brutalized by various prison officials in violation of, *inter alia*, his Eighth Amendment rights. Doc. # 2 at 3 ("In [9/04] the Plaintiff was brutally beaten and repeatedly brutalized about his head, face, and body by Defendants Lieutenant Langston, Lieutenant [Randy] Byrd, and Officer [Michael] Byrd at [RSP] at the instigation of Defendants Deputy Warden Paul and Deputy Warden Collins and condoned by Warden Rich").

Following a comprehensive Report and Recommendation (R&R) on defense summary judgment motions, along with this Court's Order adopting and rejecting parts of the R&R, Shinholster's claims have been pared down to four defendants: Reginald Langston, Randy Byrd, R. D. Collins, and John Paul. Additionally, all but his § 1983 claim have been dismissed. Doc. ## 95, 106, 108, 109 (Judgment); *Shinholster v. Rich*, 2008 WL 765824 (S.D.Ga. 3/4/08) (unpublished). Familiarity with the R&R and Adoption Order (doc. ## 78, 95) is presumed.

## III. ANALYSIS

### A. Collins, Paul, and Langston

Collins and Paul want the Court to exclude from the forthcoming trial in this case:

1. Evidence of unrelated incidents, complaints, or lawsuits involving other alleged claims of abuse at other times by any current or former employee of any Georgia State Prison.

2. Evidence of liability insurance or reference to collateral evidence concerning settlement.

3. Testimony by witnesses who have no personal knowledge of the events at issue on trial.

4. [A]ny extrajudicial statements or interviews relating to the trial or the parties or issues involved in the trial.

---

[1] Defendants are not clear why they want to bring "2 Cellular Phones" to trial. Until they are, this part of their motion is denied.

5. Testimony, evidence, reference or comments regarding Plaintiff's claim that there was a pattern or practice of using excessive force at Rogers State Prison or any prison within the State of Georgia.

6. Reference to, or evidence of, claims against Defendants under Georgia law, claims of "torture" in violation of treaties of the United States, claims made pursuant to 18 U.S.C. Section 2340, or alleged violations of the Constitution of the State of Georgia; all such claims were summarily dismissed by this Court on March 24, 2008.

7. Exclusion of any "expert" testimony by Plaintiff's witnesses because no experts were disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure or in Plaintiff's Disclosures.

8. Exclude all evidence or reference to Plaintiff's claims of conspiracy or other irrelevant theories unsupported by law or fact.

Doc. # 112 at 1-3.

Both explicitly, *see* doc. # 129 (plaintiff's response brief) at 1-8 and implicitly, *see* S.D.GA.LOC.CIV.R 7.5 ("Failure to respond shall indicate that there is no opposition to a motion"), Shinholster does not oppose points 2, 4, 6, and 7, so this *in limine* motion is granted to that extent.

As for the remaining points, as well as for essentially the same points raised by Langston, doc. ## 116, 133, some factual background is useful to inform the issues raised here. These "facts" are a product F.R.Civ.P. 56's tilt of all reasonable inferences in favor or plaintiff, who was the non-moving party when the Court elicited them from the record when resolving earlier defense summary-judgment motions, *see* doc. # 95 at 1-3:

Once Shinholster arrived at RSP on 8/14/04, doc. # 32 at 34, other inmates told him about its reputation for violence. Doc. # 32 at 35-40. A year later the Georgia Department of Corrections issued this press release:

> ATLANTA – The Department of Corrections announced today that it has completed the internal investigation into allegations of inmate abuse at Rogers State Prison in Reidsville, Georgia. The completed investigation resulted in the termination of two employees. These two are in addition to seven employees terminated at the conclusion of a previous [Georgia Bureau of Investigation] investigation as requested by Corrections' Commissioner James Donald in May of [2005]. Two employees received disciplinary action short of termination, and two others were returned to duty after being cleared of wrongdoing.

http://www.dcor.state.ga.us/COMMISSIONER/PublicRelations/PressReleases/050819.html (site as of 4/3/06); *see also* 6/16/06 ATLANTA J. CONST. E2, 2006 WLNR 10403679 ("Six former guards have accepted misdemeanor plea deals for their roles in the alleged beatings of inmates at [Rogers State] prison.... The Rogers warden, Glenn Rich, and deputy warden, R.D. Collins, were initially suspended by the Department of Corrections. The warden later retired, and the deputy warden was reinstated. Neither was charged with a crime"); *see also Graham v. Rich*, 405CV080, doc. # 127 at 19-20 (S.D.Ga. 9/8/06) (unpublished); *Boyd v. Rich*, 605CV087, doc. # 14 at 17 ¶¶ 5, 6 (S.D.Ga. 11/21/05) (unpublished) (9 employees

terminated).

Upon his arrival, Shinholster almost immediately sought transfer to another prison. Doc. # 32 at 38. A prison counselor told him that he had to spend 6 months at RSP before he could get a transfer. *Id.* at 39. Determined, Shinholster wrote Deputy Warden Collins and falsely claimed that Shinholster had a problem with another inmate. *Id.* at 42. An ex-gang member, plaintiff employed language to the effect that "if they don't transfer me I have the ability to make, you know, to cause a problem with [fellow RSP] inmates." *Id.* at 43; *id.* at 43-44 ("Q. -- basically, saying if you don't transfer me, I'm going to cause problems in your institution. A. I'm going to cause a problem with these individuals. Right.... "); *id.* at 45 ("Transfer me because I have the power to create trouble in your institution"). He also had his grandmother contact RSP management; she urged them to transfer him so he could be closer to home. *Id.* at 44-45. *See also id.* at 46 ("Q. You were trying to manipulate the situation. A. Right. Q. You were basically trying to get what you want through lying. A. Right").

For good measure, plaintiff did not sign the letter but made it seem like some other inmate wrote it so that Collins would believe that he was being warned by a third party to transfer Shinholster or else face trouble from him. *Id.* at 53 ("I snitched on myself"). He then wrote another, inflammatory letter to Collins and left it in his locker for prison officials to find. *Id.* at 54. The morning after Shinholster sent the first letter, defendants Michael Byrd and Reginald Langston came for him. Doc. # 32 at 51. They searched his locker. "[T]hat," deposes Shinholster, is when they found "the letter that Mr. Collins didn't like that made Mr. Collins upset." *Id.* at 54.

The guards took him to the RSP's visitation area, where "we was met on the walk by Lieutenant Byrd and Deputy Warden John Paul." *Id.* at 55. Randy Byrd told him to face the wall, which he did, and Deputy Warden John Paul then asked him a question he did not hear. *Id.* at 56. Randy Byrd then elbowed him in the back of the head "and he was like, boy, don't you hear the warden talking to you. I said, yes sir. He said, turn around...." *Id.* at 57.

Shinholster suffered (from the "elbow-blow") a "swelling on my forehead. The elbow in my back didn't hurt me much." *Id.* at 59. But it did hurt "all night." *Id.*

Michael Byrd and Paul took him into Deputy Warden Collins's office, where Collins stood reading Shinholster's "locker" letter. *Id.* at 59-60. Collins stated, "this is one ignorant son of a bitch," *id.*, then asked "you think you are going to run my institution?" *id.* at 61, after which Langston, while Shinholster was handcuffed, "hit me in the side of my face," *id.* "with the side of his knuckles," *id.*, "and when I fell he grabbed me up by my handcuffs, and he told me if I fall again he was going to hit me, so he hit me again ... [i]n the side of the face." *Id.* Shinholster "was just crying and crying," *id.* at 62, but not bleeding. *Id.*

Collins then asked plaintiff if he aimed to start a riot and Shinholster replied "no sir. And I said, how did I start a riot? And then he said something of the nature, you're not going to run my prison. [¶] Around that time, that is when Michael Byrd hit me from his side, the same way ... -- with his handcuff." *Id.* at 62-63. The prison officials were wearing black gloves at this time. *Id.* at 63. Plaintiff explained:

> When he hit me, I staggered a little bit. I attempted to tell *him* that he shouldn't be hitting me there, and Lieutenant [Michael]

3

Byrd told *him*,[2] that is enough, that is enough. Take him to isolation. And they [Langston and Michael Byrd] took me to isolation. They had stopped all movement so nobody could witness anything.

*Id.* at 63 (emphasis and footnote added). When Shinholster reached the isolation area, Langston told him that if he got "permission from the warden, he'd be back again later to beat my ass some more." *Id.* at 63-64. Shinholster claims that, from those blows, he now suffers increased dizziness, involuntary jaw movements, nerve damage on the left side of his face, and chronic headaches. *Id.* at 81-82. He concedes, however, that his pre-incident medical records reflect his complaints of headaches and dizziness stemming from a gunshot wound. *Id.* at 84-94.

In its 3/24/08 Order, this Court ruled that plaintiff's damages were not *de minimis*, doc. # 95 at 5-6, Shinholster's "torture" state law claims must be dismissed, *id.* at 7, his case against defendants Glenn Rich and Michael Byrd must be dismissed, *id.* at 4-5, 7 (there is insufficient "knowledge" evidence against Rich, while plaintiff's claims against Michael Byrd are time-barred), and his excessive-force based claims against Langston, Collins, Randy Byrd and Paul must proceed to trial. *Id.* at 8.

Note that Collins and Paul are not alleged to have beaten Shinholster, only Langston and Randy Byrd. Instead, plaintiff says Collins and Paul instigated the beating and, by extension, failed in their duty to intervene and stop it. Doc. # 2 at ¶ 17 ("Defendant Lieutenant Langston, Defendant Lieutenant Byrd, and Defendant Officer Byrd by their intentional actions in beating and kicking the Plaintiff when he was restrained in handcuffs and other use of extreme and excessive force against the Plaintiff at the instigation of and condoning by Defendants Rich, Collins, and Paul were executing summary punishment on the Plaintiff without due process of law...").

## B. Governing Standards

The core argument raised by the defense under F.R.Ev. 404(b) and 403 is that prior bad acts evidence (prior abusive beatings of inmates by the defendant guards here) is not relevant enough to overcome the undue prejudice all defendants will suffer before a jury. Relevancy, of course, is inextricably tied to the legal standards to be applied to the plaintiff's claims, so it is worth pausing to recapitulate those claims and the standards that govern them. Here there is, essentially, just one: his Eighth Amendment, excessive-force claim against Langston and Byrd, coupled to his failure-to-intervene claim against Collins and Paul.

### 1. *Eighth Amendment*

The Eight Amendment applies to prison officials' use of force against convicted inmates. Courts consider both a subjective and objective component: (1) whether the "officials act[ed] with a sufficiently culpable state of mind," and (2) "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quotes omitted). Thus there are subjective (culpable state of mind) and objective prongs for a fact finder to consider. Under the subjective prong, courts apply

> [f]ive factors relevant to ascertaining whether force was used "maliciously and sadistically" for the purpose of causing harm ... : (1) the extent of the injury, (2)

---

[2] The Court is unable to determine with certainty who is "he" and "him" here. Deposing counsel should remind witnesses about excessive pronoun usage.

4

the need for application of force, (3) the relationship between the need and the amount of force used, (4) any efforts made to temper the severity of a forceful response, and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

*Johnson v. Moody*, 206 Fed.Appx. 880, 883 (11th Cir. 2006); *McBride v. Rivers*, 170 Fed.Appx. 648, 655 (11th Cir. 2006). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *McReynolds v. Alabama Dept. of Youth Services*, 204 Fed.Appx 819, 822 (11th Cir. 2006). Shinholster's claims against Langston and Byrd proceed on this liability theory.

Finally, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002); *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341-42 (11th Cir. 2007); *McBride*, 170 Fed.Appx. at 655. Shinholster's claims against Collins and Paul proceed on this liability theory.

## 2. *Relevance*

This Court reached similar "relevance" issues in other RSP beating cases: *Hooks v. Langston*, 2007 WL 1831800 (S.D.Ga. 6/25/07) (unpublished); and *Graham v. Burns*, 405CV080, doc. # 232 (S.D.Ga. 8/27/07) (unpublished). Under Rule 404(b), evidence of other wrongs or acts is admissible to prove a defendant's motive, intent, plan, knowledge, or absence of mistake or accident. But

> a party seeking to admit evidence of other wrongs must satisfy a three-pronged test, to-wit: (1) the evidence must be relevant to an issue other than the adverse party's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s); and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must otherwise satisfy [F.R.Civ.P.] 403.

*Phillips v. Irvin*, 2007 WL 2310038 at * 2 (S.D.Ala. 7/27/07) (unpublished). Case law shows that actions that reveal dishonesty can be admitted. In false-arrest cases, for example,

> the plaintiff may allege that the defendants arrested him or her in order to "cover" their own actions in committing an improper assault and battery against him or her. The defendant's motive and intent will be at issue, a defense to their actions which may be analogized to "absence of mistake."

POLICE MISCONDUCT: LAW AND LITIGATION § 8:4 (*Internal affairs, disciplinary and police personnel records -- Misconduct complaints*) (Oct. 2008). That same encyclopedic source illustrates, in the following recitation of collected cases, how a defendant's prior bad acts may be relevant and thus admissible at trial:

> *See U.S. v. Mohr*, 318 F.3d 613, 60 Fed. R. Evid. Serv. 906 (4th Cir. 2003) (evidence of defendant's threat to release her police dog on another unresisting suspect admissible to show willfulness);

*Wilson v. City of Chicago*, 6 F.3d 1233, 38 Fed. R. Evid. Serv. 1280 (7th Cir. 1993), *as modified on denial of reh'g*, (Dec. 8, 1993) (trial court erred in excluding evidence that officer who tortured plaintiff had subjected another suspect to electroshock to extract a confession nine days previously; held admissible to show intent, opportunity and plan, but not propensity); *Kopf v. Skyrm*, 993 F.2d 374, 37 Fed. R. Evid. Serv. 649 (4th Cir. 1993) (evidence that canine officer had previously shot and killed a suspect who stabbed his dog, and vowed not to forget the incident, was admissible in case where there was testimony he shouted "Don't touch my dog" before he struck plaintiff in head, in order to prove that he hit plaintiff with intent to punish him and that location of blow was not a mistake); *Hooks v. Langston*, 2007 WL 1831800 (S.D. Ga. 2007) (prior assaults by correctional officer admissible to show intent to harm and common plan to abuse inmates); *Ismail v. Cohen*, 899 F.2d 183, 29 Fed. R. Evid. Serv. 1414 (2d Cir. 1990) (no error in the admission of evidence that the defendant police officer had committed misconduct similar to that alleged in the case in an incident that occurred soon after the incident at issue)....

*Id.*

Just as this Court ruled in *Hooks*, the following benchmark will be used here: If a defendant in the instant case denies abusing Shinholster, but there is some evidence (*e.g.*, plaintiff's direct testimony) that he in fact did so, then he denies not only the act of abusing him but also his intent to do so. *Hooks*, 2007 WL 1831800 at * 5. It then follows that

[s]imilar act evidence offered to show [a defendant's] intent is admissible in [this] section 1983 case because [his] intent is a relevant element of the constitutional tort. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 n. 1 (2d Cir.1988) (evidence of other instances where officer used excessive force admitted to show pattern and intent in constitutional tort case); [*Eng v. Scully*, 146 F.R.D. 74, 79 (S.D.N.Y.1993)] (same); *see also Carson v. Polley*, 689 F.2d 562, 572 (5th Cir.1982) (holding that performance reports stating that defendant officer needed to " 'work on controlling temper and personal feelings' because he 'tends to get into arguments with inmates, lets his temper flare up too quickly' " were admissible to show officer's "intent to do harm to [plaintiff]" on the day in question).

*Lombardo v. Stone*, 2002 WL 113913 at * 6 S.D.N.Y. 1/29/02) (unpublished); *Hooks*, 2007 WL 1831800 at * 5.

Under *Carson* and *Lombardo*, then, contemporaneously similar beatings by a defendant here (but not by any other prison officials, unless legally connective tissue -- like a conspiracy -- is preliminarily demonstrated) can be admitted to show his intent to abusively beat Shinholster when he handled him in any way (and here there is no dispute that he had at least some contact with plaintiff). Such evidence thus will be admitted "under the 'intent' exception to the general rule against character evidence." *Carson*, 689 F.2d at 572; *Hooks*, 2007 WL 1831800 at * 5.

Evidence passing Rule 404(b) muster is still subject to Rule 403 prejudice-balancing requirements. Each witness Shinholster proffers at trial thus will be evaluated upon timely defense objection. And, of course, any prior-bad-acts based testimony must be based on

6

personal knowledge. Hence, if all ex-guard Tommy Cardell (*see* doc. # 129 at 3-5) can testify to what *other* guards did, then his testimony is excluded. But if he personally witnessed Langston and/or Byrd abusively and contemporaneously beating other prisoners, then his testimony may well be admitted.

For that matter, evidence that Langston and Byrd routinely and abusively beat other inmates in various ways and in various areas of the prison[3] is *not* unduly prejudicial.[4] But evidence that they had mere physical contact with inmates *would* be irrelevant, as that is part of their job and suggestive of no malicious intent. Note, too, that the law cuts a wide swath here. *See McBride*, 170 Fed.Appx at 655 (Prison officials did not use excessive force in violation of inmate's Eighth Amendment rights, even though, after securing and handcuffing him following a fight with another prisoner, they allegedly repeatedly punched him in the back of his head, on his back, and on his left side, and kneed him four to six times on the left side of his face; although the officials arguably could have used less force after restraining the inmate, there was no evidence showing that their measures were taken maliciously and sadistically for the very purpose of causing harm). So the Court will apply a *McBride*-level benchmark in considering the admission of prior bad (abusive beating) acts.

To summarize thus far, all witnesses who do not fit the above-described admissibility criteria are barred from testifying, and to that extent the Court grants defendants' *in limine* motions. Otherwise, oral testimony may be admitted.

Raised in *Graham* was the notion of documentary (prison grievances) evidence. *Graham*, 405CV080, doc. # 232 at 3. If a defendant (like Langston, doc. # 129 at 4 ("Defendant Langston denies *any* use of force on Plaintiff")) denies that he engaged in any beatings during a claimed time period, an inmate witness may testify that he documented the date of a particular, *defendant*-committed (and Rule 404(b)-admissible) beating, by contemporaneously filing or transmitting a grievance or some other written form. *See Graham*, 405CV080, doc. # 232 at 3-4 (prison "business record" rule with respect to grievances).

### 3. *F.R.Evid. 608(b)*

Finally, even if the Court concludes at trial that a particular quantum of evidence is unduly prejudicial and thus must be excluded from plaintiff's main presentation, that does not rule out its use as under F.R.Evid. 608(b) for cross-

---

[3] The Court rejects Langston's "situational distinction" (*see* doc. # 133 at 3 (arguing that beating plaintiff in an office in front of other officials is distinguishable from beating other inmates alone, in a shower stall) as unconvincing. What crosses the line here is abusive beating behind closed doors, *not* whether it occurred in an office or a shower stall, nor how many witnessed it.

[4] A sufficient number of such beatings may well rise to serve as habit evidence. F.R.Evid. 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

*Id.* Subtle nuances, not all of them readily graspable, pervade this area of law. *See generally*, 1 UNCHARGED MISCONDUCT EVIDENCE § 1:15 (March 2008) ("Both at common law and under the Federal Rules some courts extend the definition of habit to include highly volitional conduct. In these courts, the distinction between habit evidence and testimony about numerous acts of uncharged misconduct tends to blur") (footnotes omitted).

examination. *See Hinhosa v. Butler*, ___ F.3d ___, 2008 WL 4671718 at * 7 (5th Cir. 10/23/08) (reversing judgment and remanding for new trial an arrestee-beating, excessive-force case; district court erred in excluding from jury's hearing plaintiff's cross-examination of arresting officer, who invoked his Fifth Amendment right not to testify, about officer's prior bad acts).[5]

---

[5] As the prior acts description in that case shows, prior bad acts can be reasonably far-ranging:

> A review of the record, however, makes plain that the fate of Hinojosa's excessive force claim turned on credibility; whether the jury believed that [the defendant arresting officer] Butler used excessive force against Hinojosa turned on the extent to which Butler's characterization of Hinojosa's behavior, and the threat he posed, was credible. To prove that the force applied by Butler was gratuitous, Hinojosa sought to offer evidence that Butler had a *habit* of dishonesty in doing his job, or in justifying certain acts committed while on the job, and therefore that his characterization of events on the night in question deserved little credence. Given that there were no witnesses to the arrest, credibility was paramount at trial. Butler's refusal to discuss, for risk of self-incrimination: (1) his admitted dishonesty in explaining why [in the past, in an unrelated incident] he had fired his service weapon; (2) his alleged violation of internal rules in order to protect a City employee; (3) his alleged dishonesty in claiming that his patrol car was involved in a collision; and (4) the fact that his [post-incident] resignation from [his police department] followed these incidents, would have damaged, and was thus highly probative as to, Butler's credibility.

*Hinhosa*, 2008 WL 4671718 at * 6.

## IV. CONCLUSION

The motion (doc. # 111) of defendants R. D. Collins and John Paul to continue the trial is *DENIED* as moot. Their equipment-request motion (doc. # 113) is ***GRANTED in part and denied in part***. The motion *in limine* filed by defendants Reginald Langston, R. D. Collins and John Paul, meanwhile, is ***GRANTED in part*** and ***DENIED in part***. Doc. ## 112, 116. The above caption (the parties persist in including a dismissed defendant in the caption on their pleadings)[6] is controlling; all subsequent filings shall conform.

This __28__ day of October, 2008.

/s/ B. Avant Edenfield
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[6] For example, the parties are still including "Lieutenant Byrd" on the caption when in fact his name is Randy Byrd, and this was clarified by the Court's Order docketed at entry # 95. *See* doc. ## 112 at 1, 116 at 1, 129 at 1, 133 at 1. They also include "Glenn Rich" as a defendant even though the Court dismissed him. *Id.* (The Clerk erroneously continued to do so, too, and the Court has just corrected that error). Finally, plaintiff continues (*see* doc. # 129 at 1) to misspell Reginald Langston as "Regional Langston" even though the Court illuminated that error at Doc. # 95 at 5 n. 5. "Ministerial tidiness" leads to accurate final judgments. Judges and parties also want to be able to open a case file and reap the convenience of learning who is left in a case by consulting the caption; at a minimum, they should not be misled by it.